**GENERAL MOTORS CORPORATION, Appellant,**

v.

**Rita L. IRACHETA, Administrator of the Estates of David Iracheta, Deceased, and Edgar Iracheta, Deceased; John H. Russell, Administrator of the Estate of Silvandria Iracheta, Deceased, Appellees.**

No. 04–01–00160–CV.

Court of Appeals of Texas, San Antonio.

May 31, 2002.

Rehearing Overruled Aug. 29, 2002.

Cary A. Slobin, Kyle H. Dreyer, Jeffrey J. Cox, Hartline, Dacus, Dreyer & Kern, L.L.P., Dallas, Donato D. Ramos, Person, Whitworth, Ramos, Borchers & Morales, L.L.P., Laredo, Darrell L. Barger, Barger, Hermansen, McKibben & Villarreal, L.L.P., Corpus Christi, Sharon E. Callaway, Crofts & Callaway, P.C., San Antonio, for Appellant.

Luther H. Soules, III, Soules & Wallace, P.C., San Antonio, Rusty Meurer, Kazen, Meurer & Perez, Kenneth A. Valls, Wilson, Trevino, Freed, Casso & Valls, L.L.P., Laredo, Robert E. Lapin, Carrigan, Lapin & Landa, L.L.P., Houston, Vincent L. Marable, III, Law Firm of Paul Webb, P.C., Wharton, for Appellee.

Sitting: SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, and SANDEE BRYAN MARION, Justice.

Opinion by: KAREN ANGELINI, Justice.

Rita L. Iracheta ("Iracheta") brought suit against General Motors Corporations ("GM"), alleging that a design defect in the Toronado her two grandsons were riding in proximately caused their deaths. A jury found a defect existed, which caused one child's death, and awarded Iracheta $10,004,500.00 in actual damages and

$750,000.00 in exemplary damages. GM appeals. We affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL HISTORY

Silvandria Iracheta and her sons, Edgar and David, were traveling in a 1988 GM Toronado on Highway 83 between Eagle Pass and Laredo, Texas. Silvandria crossed over into on-coming traffic and collided with an eighteen-wheeler. The truck's fuel tank ruptured, splashing diesel fuel over both vehicles. Silvandria was killed instantly.

After the collision, the Toronado came to rest on a downward incline off the roadway. It was on fire. Based on eyewitness accounts, a second fire erupted. Both Edgar and David died.

Iracheta brought this products liability action against GM[1] on behalf of the estates of her grandsons, David and Edgar. Iracheta claimed that the defectively designed fuel system of the GM Toronado David and Edgar were riding in caused a post-collision fuel-fed fire, which burned David and Edgar to death.[2]

Following trial, a jury found that a design defect in the Toronado's fuel system was the producing cause of Edgar's death. The jury, however, found that David's death was not caused by the defect and refused to find that the boys' mothers' negligence caused Edgar's injury.[3] The jury awarded Edgar's estate $10,004,050.00 for conscious pain and suf-

fering and found GM acted with malice. GM stipulated to $750,000.00 in exemplary damages, based on the jury's malice finding.

GM filed a motion for judgment non obstante veredicto/motion to disregard jury answers. The trial court overruled GM's motions and entered judgment in the amount of $10,004,050.00 in actual damages, plus prejudgment interest, and $750,000.00 in exemplary damages. The trial court overruled GM's motion to modify the judgment and alternative motions for new trial and remittitur. GM raises nineteen issues on appeal: the evidence is insufficient to support the jury's findings; whether a change in an expert's opinion without supplementation of or amendment to discovery responses mandates exclusion of the testimony; whether compliance with federal safety standards establishes an absence of malice as a matter of law; whether the trial court's instruction regarding Silvandria Iracheta's negligence was error; whether Iracheta's speech to the jury constitutes incurable jury argument and whether the lack of a record of that speech mandates a new trial; whether Iracheta's use of peremptory strikes violated *Batson;* and whether the jury's $10 million award for pain and suffering is manifestly unjust.

## SUFFICIENCY OF THE EVIDENCE

In multiple issues, GM challenges the sufficiency of the evidence supporting the jury's findings. Specifically, GM main-

---

1. Iracheta also sued Hamm's Discount Tire Service d/b/a Hamm's Quality Retail Center. Iracheta nonsuited Hamm's before trial.

2. Iracheta's theory regarding the design defect in the Toronado's fuel system, as stated in her pleadings, is as follows:

 The Toronado was defective and unreasonably dangerous for lack of a proper fuel shut-off valve or other anti-siphoning device which lack allowed the gasoline to siphon

and cause the ensuing fire on the occasion in question. The defective design of the Toronado was a producing cause of the Minor Decedents' deaths and the damages to Plaintiffs. Moreover, there existed a safer alternative design at the time the Toronado left GM's control.

3. It is undisputed that Silvandria Iracheta, the boys' mother, caused the crash.

tains the evidence is legally and factually insufficient to support the jury's finding that a design defect existed, that the defect caused Edgar's injuries, that Edgar experienced conscious pain and suffering, and that GM acted with malice.

## A. Standard of Review

In assessing whether the evidence supporting a jury finding is legally sufficient, this court considers only the evidence favorable to the jury's decision and disregards all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Thrift v. Hubbard,* 974 S.W.2d 70, 77 (Tex.App.-San Antonio 1998, pet. denied). If there is more than a scintilla of evidence to support the finding, then the no evidence challenge fails. *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987); *Thrift,* 974 S.W.2d at 77. In considering a challenge to the evidence's factual sufficiency, this court reviews all of the evidence in a neutral light and reverses for a new trial only if the challenged finding shocks the conscience, clearly demonstrates bias, or is so against the great weight and preponderance of the evidence that it is manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Thrift,* 974 S.W.2d at 77.

## B. Design Defect

■ GM first attacks the legal and factual sufficiency of the evidence supporting the finding that a design defect existed in the Toronado's fuel line. Specifically, GM makes the following complaints: 1) there is no evidence the Toronado fuel system failed to withstand the crash, and 2) Iracheta produced no evidence of a post-crash siphoning fuel-fed fire because Iracheta's fire expert based his opinion on his incorrect understanding of another expert's opinion.[4]

To establish a design defect, a plaintiff must prove that the design renders the product unreasonably dangerous, taking into consideration the utility of the product and the risk involved in its use, and that a safer alternative design exists which would substantially reduce the risk of injury and be economically and technologically feasible. TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a) (Vernon 1997); *General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 588 (Tex.1999); RESTATEMENT (SECOND) OF TORTS § 402A (1965).

### 1. Evidence of Failure

GM complains there is no evidence that the Toronado's fuel system failed to withstand the crash. According to GM, there is only surmise or speculation that the rear return line actually ruptured and that the

---

**4.** GM briefly asserts that because the circumstances under which the fuel system failed were so unusual or extreme and not reasonably foreseeable, Iracheta's crashworthiness claim must fail. According to GM, "a head-on collision with both vehicles traveling 60 mph is an extreme circumstance which a fuel system cannot be held to be unreasonably dangerous if it did not withstand such."

"Foreseeability of risk of harm is a requirement for liability for a defectively designed product; a product need not be designed to reduce or avoid unforeseeable risks of harm." *Hernandez v. Tokai Corp.,* 2 S.W.3d 251, 257 (Tex.1999) (applying foreseeability consideration to misuse of product). "[A] product

that is safe for its intended use is not defectively designed merely because it is unsafe in other circumstances." *Id.* (analyzing whether product intended for adults only was defective when child was injured while playing with product).

A collision such as the one in this case may be extreme, but it certainly is not unforeseeable. In fact, Richard Kirkpatrick, a former GM employee, admitted that high-speed collisions occur on highways every day. When asked whether "General Motors knew about that, that was foreseeable and understandable to General Motors ...," Kirkpatrick responded "Yes, sir."

jury would have had to engage in impermissible inference stacking to make such a finding.

Iracheta presented two experts who testified regarding the failure of the return line: John Stilson and Ed Sanchez. Stilson, a mechanical engineer, testified extensively about his theory of defect in the fuel system. Stilson's opinions were based on his examination of the Iracheta's vehicle, as well as tests conducted on an exemplar vehicle. Generally, Stilson believes gas siphoned out of the *forward* portion of the return line. Sanchez, an arson investigator, was Iracheta's fire origin expert. It is Sanchez's opinion, based on eyewitness testimony, that a fuel hose near the *rear* of the vehicle separated on impact, allowing fuel to siphon from the car's fuel tank. Sanchez relied on Stilson's opinion, as well as the fact that he ruled out other potential "holes" in the fuel system,[5] to reach his conclusion. GM relies on this apparent conflict, as well as the fact that Sanchez is unqualified to testify regarding where the fuel system failed, for its assertion that there is no evidence that the Toronado's fuel system failed to withstand the crash.

■ First, we note that Sanchez was not qualified to render an opinion regarding where the siphoning actually occurred.[6]

5. Specifically, Sanchez testified:
 - the fuel tank did not rupture;
 - the metal lines, connected to the rubber hoses, were not broken or severed;
 - the vapor line did not siphon because the line is not in the fluid itself;
 - the fuel feed line did not siphon because it has a valve, which prevents siphoning;
 - Stilson agreed with Sanchez that neither the fuel fed line, the vapor line, nor the feed line allowed fuel to siphon;
 - even if the filler neck was ruptured or dislodged, the amount of vapors that would have been released would have been insignificant;
 - no boil over effect (heat applied to gas tank causing fuel to boil out of the tank) because the tank was exposed only to a rapid flash fire immediately upon impact. Sanchez cannot confirm the grass was burning underneath the car, constantly heating the gas tank, because no witness testified to that fact;
 - the fire was not caused by diesel fuel splashed from the impact, because most of it spilled onto the road and onto the Iracheta's vehicle. Diesel requires extremely high and consistent temperatures to ignite and stay burning. Diesel had nothing to do with the "whoosh," but could have accelerated the fire that erupted after the "whoosh;"
 - siphoning is consistent with the eyewitness testimony.

According to Sanchez, after all other possibilities have been removed, the only remaining avenue for fuel to siphon from the tank was the return line at the rubber hose connection. Sanchez explained that upon impact, the rear hose was shoved back toward the rear of the car from the front, causing the hose to dislodge.

6. Iracheta claims that GM did not object to Sanchez's qualifications or the reliability of his testimony. To the contrary, at a pretrial hearing, GM filed a motion to exclude Sanchez's testimony. GM specifically characterized its motion as a "straight-forward *Robinson* type motion" and presented the motion under Rule of Evidence 702, *Robinson*, and *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713 (Tex.1998). GM first argued Sanchez was unqualified to testify in his area of professed expertise—fire. Also, GM asserts that Sanchez is to testify on how the vehicle siphoned. Specifically, GM argued:

> Finally, he's giving opinions that the vehicle siphoned, and I think this is very important, Your Honor. He talks about the vehicle siphoning and how the vehicle siphoned. And if the Court will look there, he has no experience in automotive design, never worked for an auto manufacturer.... When asked if an anti-siphoning device would prevent a fuel fed-fire—this is their theory. He was asked that question—he said he would have to defer to an automotive engineer. He's a fire expert.

Any claimed error is preserved. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409–10 (Tex.1998) ("To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered").

**732**

Nothing in the record shows Sanchez's engineering opinion—that the fuel line ruptured in the rear end of the car—is reliable. *See E.I. du Pont de Nemours and Co., Inc. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995). In fact, Sanchez admitted he is not qualified to render an engineering opinion. Accordingly, Sanchez's opinion that the crash caused an opening in the rear portion of the fuel return line is little more than "subjective belief or unsupported speculation" and amounts to no evidence. *Robinson,* 923 S.W.2d at 557. We, therefore, cannot consider Sanchez's testimony regarding *where* the fuel system opened.

It is noteworthy that Sanchez opined that the fuel-fed fire ignited at the rear portion of the vehicle. Stilson, however, testified that the front rubber hose of the Toronado's return line failed and "that the [rear] fuel hose burned away rather than being compromised in the collision." It follows, according to GM, that "there is no evidence of defect because the only expert qualified to give an opinion on causation of siphoning denied that the rear fuel hose was compromised in the collision—defeating the only theory of defect Plaintiff presented to the jury."

Stilson's comments as a whole show that *one explanation* for a compromise of the rear hose is that it burned away. Specifically, Stilson testified as follows:

A: [The return line] opened both at the front line and the rear line. The hoses—the steel lines remained, at least from the forward engine compartment rubber hoses, the steel lines during the course of this collision remained totally intact all the way back to the fuel tank. The only areas where I found that the lines would have opened, and that's both the return and the feed but we'll talk about the return line, is that the forward rubber hose and at the rear rubber hose. *So both of those areas opened up in the course of this entire event. That meant that from the time of the collision till the time that this fire was extinguished, both of those fuel lines opened up....*

Q: Okay. Did you make an initial determination of your own in this case as to where the return line initially opened up?

A: I did.

Q: And what was your opinion?

A: The *forward rubber hose* on the return line where it comes up in the front of the dash panel from beneath the vehicle up to the engine connection, the steel engine connection, that rubber hose section was—failed in some manner. Now it's burned away on the subject vehicle....

Q: Did you ever offer an opinion, Mr. Stilson, regarding what you think might have caused the *rear hose* to open in this accident?

A: Yes.

Q: And what was your opinion, sir?

A: My opinion was and is that *one explanation for the opening of that rubber hose was it was burned away by the fire. That's one explanation.* Because it's burned away right now....

Q: Regardless of how this [system] opens up, do your opinions remain the same?

A: My opinions are not dependent on where it opens up. *My opinion is that this system siphons if it opens up in the flexible hose areas, the forward and the rear, regardless. It will siphon if you open up the steel areas. So I don't care where*

*it's opening up. Whether it's steel or whether it's rubber, once it opens up, it's going to siphon and that's the defect.*

Dr. Juan M. Herrera, a mechanical engineer, college professor and GM's engineering expert, testified that rubber hoses can only break when they are pulled apart, not when they are compressed. Here, according to Herrera, the hoses would have been compressed in the accident, not pulled apart, and would not have ruptured.

Summarily, we are left with Stilson's opinion that the front rubber hose of the return line failed in some manner; Stilson's opinion that one explanation for a compromise in the rear hose is that it burned away; and Herrera's opinion that the hoses did not rupture. Viewing this evidence in the light most favorable to the jury's verdict, there is legally sufficient evidence to support a finding that the Toronado's fuel system failed during the crash. And the jury's finding of a failure in the fuel lines is not against the great weight and preponderance of the evidence.

2. *Evidence of Fuel Siphoning and Fuel–Fed Fire*

■ GM also argues there is no evidence that fuel actually siphoned from the Iracheta vehicle causing a fuel-fed fire. Stilson began his testimony by stating that in a 1988 Toronado "the tank contents can siphon from this fuel tank and do siphon and will siphon resulting in what is called, first of all, fuel fire, and secondly, fuel fed fire." Stilson testified that he believes gas siphoned out of an open return line in this accident. The defect, according to Stilson "is that the tank siphons. The fact is that the line opened up. Ed Sanchez has his opinion and I have mine, and they don't change the, when the line opened, that *the system siphons, and that's the defect.*"

Sanchez testified that the eyewitnesses' testimony regarding the second fire is consistent with a fuel-fed fire resulting from fuel siphoning from the gas tank. Sanchez testified that the witnesses told him "they heard the whoosh, ... almost instantly they felt a warm sensation, they saw a violent reaction, fire coming out of the underside of the vehicle." No witness suggested there was a grass fire underneath the car or an engine fire. According to Sanchez, a violent reaction such as the one described by eyewitnesses to the accident is a detonation of volatile vapors. The only flammable material underneath the car was gasoline vapors, which ignited the fire. Sanchez testified that the fire detonated at the rear of the vehicle.

Problematically, Stilson theorized that the return lined opened near the front of the vehicle as a result of the initial impact, but Sanchez determined that the fire detonated near the vehicle's rear. Although this conflict may appear to be fatal to Iracheta's claim, Sanchez recognized that there might be a conflict between his theory and Stilson's. Specifically, Sanchez stated: "But it could have been either/or, it's immaterial, the gasoline is out of that environment, out of the contained fuel system. Whether it did leak in the front or whether it leaked in the back is immaterial in my opinion." [7]

GM counters that it "introduced evidence that there were no tests that showed the line would open and siphon and no reports that such had ever happened." Richard Kirkpatrick, a former chair of the GMC fuel system technical committee, testified that tests on the Toronado showed it did not siphon under crash conditions and that there were no reports from the field that the Toronado fuel system siphoned. Furthermore, GM presented pictures of a

---

**7.** These statements were read to the jury from Sanchez's deposition.

"crimp" in the front portion of the return line. GM's expert theorized that the crimp precluded the return lines from siphoning. Herrera testified that the crimp in the forward fuel lines effectively shut off the line to any possibility for siphoning.

Viewing this evidence in the most favorable light to the jury's verdict, we hold there is sufficient evidence of siphoning to support the jury's finding. Viewing the evidence in a neutral light, the evidence that the fuel system did not siphon is not so overwhelming to render the jury's verdict a manifest injustice.

### C. *Causation*

█ GM also argues there is legally and factually insufficient evidence to support the jury's finding of injury and of causation of injury. Injury, according to the charge "refers to conscious physical pain and emotional pain, torment and suffering ... after the whoosh, if any." Specifically, GM maintains "[t]here is no evidence that 'but for' the fire associated with the claimed fuel siphoning defect, Edgar would not have had conscious pain and suffering from burn injuries." According to GM, the evidence shows Edgar suffered conscious pain before but not after the whoosh.

To establish liability for a design defect, a plaintiff must prove that the defect was a producing cause of his injury. Tex. Civ. Prac. & Rem.Code Ann. § 82.005(a)(2) (Vernon 1997). A producing cause is "an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages complained of, if any." *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995); *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975). Included within producing cause is cause in fact, which means that the defendant's conduct must have been a substantial factor in bringing about the injury and that the injury would not have occurred but for the defendant's conduct. *Allbritton*, 898 S.W.2d at 775; *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 357 (Tex.1993).

#### 1. *Evidence Adduced at Trial*

GM contends there is no evidence to support a finding that "any defect in the 1988 Oldsmobile Toronado was a producing cause of injury to Edgar." Our inquiry must focus on whether there is any evidence to support the jury's finding that Edgar experienced "conscious physical pain and emotional pain, torment and suffering, if any, ... after the whoosh," as defined in the charge. Two eyewitnesses to the accident, Juan Barcena and Jose Villarreal, as well as the driver of the truck involved in the accident, Grant Hellerman, testified at trial.[8] Two physicians also testified regarding the pain and suffering Edgar may have suffered.

#### a. *Jose Villarreal*

Jose Villarreal witnessed the accident and was the first rescuer to reach the Toronado. According to Villarreal, after most of the smoke cleared, he could see a hand waving inside the car as if someone was trying to put out flames. Although the grass around the car was burning, the exterior of the car was not on fire. When Villarreal reached the car, he could see Edgar was alive and had only a small cut on his forehead. Later, *after the whoosh*, Villarreal observed blisters develop on Edgar's arm. Specifically, Iracheta's attorney asked Villarreal:

Q: The first time that you saw any fire blisters on Edgar Iracheta's body would have been before or after the whoosh?

---

8. Villarreal and Grant Hellerman testified at trial by video deposition.

A: It had to have been after I heard the whoosh because I was inside the car and as I was backing out, that's when I saw the blisters on him.

Q: And that was after the whoosh?

A: Yes. . . .

Q: And are you saying the last sign that you had of Edgar as you were backing off was his eyes making contact with you?

A: Yes, sir. And I saw a big blister on his forehead.

Q: So he was clearly still alive at that moment?

A: Yes.

Q: No doubt in your mind about that?

A: Well, he was looking at me.[9]

Villarreal had no memory of hearing screams from the compartment after the whoosh. Villarreal believed he could have rescued the boys had the whoosh not occurred.

### b. *Juan Barcena*

Juan Barcena and his wife were travelling behind the Iracheta vehicle and witnessed the accident. Barcena attempted to render aid. Barcena testified that as he neared the Toronado, he could hear voices, screaming, moaning, and pleading for help. Edgar was screaming for help and turned to look at Barcena. According to Barcena, the grass surrounding the Toronado was on fire, and the worst part of the fire was on the right side of the car's hood in front of Edgar on the other side of the windshield. There was also fire in the front seat area, but wind from the back of the car was pushing the fire away from Edgar. Even so, Barcena "could see the boy was very burned by then." Barcena described Edgar's skin as swollen, to the point he could no longer tell what the child's gender was. Also, Edgar's face and hair were singed. On cross examination, Barcena stated "[t]he boy was bad by then, because when he would talk to me and ask for help, I could see that he would lose consciousness. He would let his head roll forward, and in a minute or less than a minute he would come to again." Barcena made clear that this all occurred *before* the explosion. Barcena testified that had there been no explosion, he believed he could have rescued Edgar.

Barcena was deposed before trial. Portions of his deposition were read to the jury. In his deposition, Barcena testified that, although he was not looking directly at Edgar when he heard the whoosh, he knew the boy was still conscious because he could hear him.

### c. *Grant Hellerman*

Grant Hellerman was the driver of the truck involved in the accident. Hellerman approached the vehicle and heard Edgar screaming, saying "help me, it hurts." Hellerman noticed the front end of the car was burning and there was a small amount of fire underneath the dashboard but "it didn't appear as though it was like on fire or anything." Hellerman testified that only Edgar's legs might have been burned by this fire. However, a breeze was blowing flames from the front end of the car up over the dashboard. Before the whoosh, Edgar's clothing was not on fire. Hellerman left the Toronado to retrieve a fire extinguisher from his car. When he returned Edgar was unconscious. After the whoosh, Hellerman never heard Edgar say another thing.

9. Portions of Villarreal's deposition were read into the record during Dr. Vincent DiMaio's testimony. In his deposition, Villarreal recounted the accident and concluded the Edgar was alive after the whoosh.

#### d. *Dr. Joseph Burton*

Dr. Joseph Burton, a forensic pathologist, testified on Iracheta's behalf. First, he explained his conclusions were based on a reasonable degree of medical probability. Because of the soot in Edgar's airways and the carbon monoxide in his blood, as well as the absence of bodily trauma, Burton concluded Edgar died from the fire. He further concluded that Edgar experienced a period of pain and suffering before the whoosh, and a brief period of pain and suffering following the whoosh. According to Burton, this briefer period lasted anywhere between fifteen seconds and two minutes.

GM contends Burton's testimony is based on assumptions not supported by the evidence and is not based on reasonable medical probability. According to GM, Burton "clearly based his opinion on the duration of pain and suffering on the fact he was told by Plaintiff's counsel that a witness testified Edgar moved after the whoosh and continued to look about." GM contends there is no such testimony that Edgar moved or looked about after the whoosh. However, Villarreal testified that Edgar was alive and looking at him after the whoosh. Also, the following colloquy between Burton and GM's trial counsel clarifies what Burton understood about the witness testimony:

Q: What witness did Mr. Lapin tell you, if any, saw either of these two boys move or do anything after the collision? After the whoosh, I'm sorry.

A: Mr. Lapin told me their names, but I don't remember their names.

Q: So Mr. Lapin told you that the testimony in this courtroom was that some witness had testified that they saw these two boys moving after this whoosh?

A: That they saw *David* move three times, make moans or groans or something like that, they saw *Edgar* still sitting upright starring and looking about and then watched blisters developing on Edgar's face. I believe that's what Mr. Lapin related to me.

Burton's comments are consistent with what the evidence shows—that Edgar looked at Villarreal after the whoosh. Burton further based his testimony on an assumption that the whoosh arose because of a design defect in the Toronado. There is evidence in the record to support that assumption. Burton's testimony is additionally based on Edgar's autopsy, which indicated he suffered no other injuries, and on eyewitness accounts of Edgar's behavior both before and after the whoosh.

Burton testified that when a person's face swells and his skin becomes transparent as a result of fire, that person has suffered from either "deep second or third degree burns and they could survive with those if nothing else happens after that potentially." There is pain and suffering associated with burns of this magnitude. But, according to Burton, "when you get deep third degree burns, the area where you have the deep third degree burns doesn't feel pain because the nerve endings are burned away."

#### e. *Dr. Vincent DiMaio*

Dr. Vincent DiMaio, the Chief Medical Examiner for Bexar County and a board certified clinical, anatomical and forensic pathologist, performed the autopsy on Edgar. Based on Edgar's autopsy, DiMaio concluded Edgar died of extensive burns and was "alive during some time of the fire. Obviously, not throughout the whole fire." DiMaio concluded that Edgar was "dead prior to [the whoosh] or so far gone, so close to death that he had no perception

at all." Specifically, DiMaio explained Edgar received his life threatening injuries before the whoosh

> [b]ecause there is no indication that he reacted to anything at the time or after or even immediately before; that is, he didn't move, he didn't react, yet if this whoosh is supposed to be very hot flames and very hot gases and there is no reaction, which means he is either dead or in such a comatose condition that he is not feeling anything.

DiMaio testified that "[i]t is not uncommon in fires like this for people to say they hear moans, and then when we do the autopsies, there is absolutely no way the person was alive.... And what they are prescribing to moans are the fire, and it is the hot gases going through the frames of the car, the broken metal frame." DiMaio also explained that with third-degree burns, the nerve endings, or pain receptors, are burned away and the person will have no sensation. Vesicles or blisters are associated with a second-degree burn. Objective signs of a third-degree burn include swelling and a translucent appearance to the skin. DiMaio further opined that people die with their eyes open and that it would be difficult to tell if someone were alive simply because that person's eyes were open, particularly when the person had been dead for a very short time.

DiMaio admitted that he could not discern when, during the course of the fire, Edgar received third-degree burns because there are too many variables, including the fact that the fourth-degree burns have obscured everything. DiMaio's "timeline" is based solely on the witnesses testimony. DiMaio conceded that even if Edgar had received third-degree burns over part of his body, he would still be able to feel sensation and pain in the parts of his body that had not been burned to the same degree.

DiMaio countered that "since there was no reaction, you have got three possibilities. One, he had third-degree burns and didn't feel anything. Two, he was dead. Or three, he was almost to the point of death." "No reaction" means to DiMaio, that Edgar was neither moving nor making sound.

### f. *Discussion*

Villarreal unqualifiedly testified that Edgar was alive and made eye contact with him after the whoosh. And although most of Barcena's testimony deals with Edgar's condition before the whoosh, Barcena testified that, after the whoosh, Edgar was conscious because Barcena could hear him. However, Hellerman testified that before the whoosh, Edgar was unconscious and that he never made another sound. Burton testified that Edgar suffered briefly following the whoosh, and DiMaio believes Edgar was dead or so close to death that he could no longer feel any sensation. DiMaio did acknowledge that Edgar would have sensation in those parts of his body that had not suffered third degree burns. Viewing the evidence in a light favorable to the jury's verdict, the evidence is legally sufficient to support the jury's findings that the "whoosh" caused injuries to Edgar. From the evidence we can infer that Edgar was alive and conscious after the whoosh and that he suffered for a brief time following the whoosh. Viewing all the evidence in a neutral light, the evidence is factually sufficient. Even though there is evidence to suggest Edgar was unconscious before and after the whoosh, that evidence is not so overwhelming so as to render the evidence supporting the jury's verdict factually insufficient. Accordingly, there is sufficient evidence to support the jury's damages award.

GM makes a distinction between evidence of being alive and evidence of being

conscious. GM claims that Villarreal's testimony that Edgar was alive after the whoosh and Barcena's testimony that he could hear Edgar after the whoosh is "not evidence of conscious reaction to pain." Conscious pain and suffering may be proved by circumstantial evidence. *Landreth v. Reed,* 570 S.W.2d 486, 492 (Tex. Civ.App.-Texarkana 1978, no writ.). GM is correct in pointing out that "[t]he only pain for which there can be a recovery is that which the child consciously experienced, and events that occurred subsequent to a merciful unconsciousness did not prolong nor increase the suffering and are not compensable." *Russell v. Ramirez,* 949 S.W.2d 480, 491 (Tex.App.-Houston [14th Dist.] 1997, no pet.) (citing *Canales v. Bank of California,* 316 S.W.2d 314, 318–19 (Tex.Civ.App.-Eastland 1958, writ ref'd n.r.e.)). Here, there is circumstantial evidence—Edgar looked at one witness and another witness heard Edgar after the whoosh—that Edgar was alive and reacting to the flames. This evidence gives rise to a reasonable inference that Edgar was conscious.

### 2. *Lost Chance*

GM finally contends that Texas does not recognize a cause of action based on the doctrine of "lost chance," which, according to GM, is one of Iracheta's "main causation theories." GM bases this assertion on Iracheta's evidence suggesting that had the whoosh not occurred, Edgar could have been rescued. Iracheta points out she did not plead "lost chance" and that the doctrine is not appropriate for this type of case.

First, Iracheta's pleadings allege GM is strictly liable for Edgar's death because a design defect in the Toronado was the producing cause of his death. Iracheta also pleads GM was negligent by failing to include a proper fuel shut off valve or other anti-siphoning device in the Torona-

do's fuel system, allowing gasoline to siphon from the fuel tank and by failing to recall the Toronado to install an anti-siphoning device. Iracheta did not plead lost chance.

Second, in *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397 (Tex.1993), the Texas Supreme Court held that Texas does not recognize a common law cause of action for lost chance of survival *in a medical malpractice case.* There is no liability for negligent medical treatment "that decreases a patient's chance of avoiding death or other medical conditions in cases where the adverse result probably would have occurred anyway." *Id.* at 398. Both cases GM relies on are medical malpractice cases.

### D. *Malice*

█ The jury found that the harm Edgar suffered resulted from GM's malice. GM argues there is no evidence to support the jury's finding. Alternatively, GM claims that because the Toronado met or exceeded federal safety and integrity standards, exemplary damages against GM cannot be maintained.

### 1. *Evidence of Malice*

Exemplary damages, in common law tort actions, may be awarded when the plaintiff has proven malice by clear and convincing evidence. Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a)(2) (Vernon 1997). Malice, as defined for the jury here, is:

[A]n act or omission by General Motors

(i) which, when viewed objectively from the standpoint of General Motors at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which General Motors had actual, subjective awareness of the risk

involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. *Id.* § 41.001(7).

The definition of malice consists of both an objective and subjective prong. *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 325–26 (Tex.1993). Objectively, the defendant's conduct must involve an extreme risk of harm. *Id.* at 326. The extreme risk prong is satisfied only by evidence showing " 'the likelihood of serious injury' to the plaintiff." *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 22 (Tex.1994) (quoting *Alexander,* 868 S.W.2d at 327). Subjectively, the defendant must have actual awareness of the extreme risk created by the conduct. *Id.* More specifically, there must be "proof that the defendant knew about the danger, but its acts or omissions demonstrate that it did not care." *General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 596 (Tex.1999). An act or omission that is merely thoughtless or careless is not enough; the actor must proceed with actual conscious indifference to the risk. *Moriel,* 879 S.W.2d at 20. The defendant's subjective mental state may be proven by direct or circumstantial evidence. *Id.* One of the main factors supporting an award of punitive damages is the fact that a manufacturer is aware of design changes that would have made the product safer. *Sanchez,* 997 S.W.2d at 597.

GM claims that, objectively, "[t]here is no evidence in this case that General Motors' conduct was so extreme as to create the 'likelihood of serious injury.' " GM's expert, Richard Kirkpatrick, agreed that siphoning from the fuel tank is very dangerous and poses a significant risk of harm to the automobile passenger. Kirkpatrick stated that siphoning from a fuel tank is an "undesirable" condition and admitted that GM was well aware of that fact years before it made the 1988 Toronado. *See Sanchez,* 997 S.W.2d at 596. Kirkpatrick also testified that no tests revealed to GM that the Toronado fuel system would siphon under crash conditions and there had been no field reports of that particular system siphoning.

Iracheta's experts were able to siphon fuel from the tank of the exemplar Toronado when it was positioned at the same angle as the Iracheta's vehicle following the crash. Thomas Green, a mechanical engineer who testified on Iracheta's behalf, stated that GM knew since the 1960s that siphoning could occur. Iracheta introduced a patent issued to GM in 1966. The patent was issued to prevent siphoning during "the use of automotive vehicles in that if a car is parked on a hill facing down the incline and the engine is stopped, the fuel supply line is apt to act as a siphon and continue the flow of fuel from the supply tank to the engine possibly to flood the intake manifold and the combustion chambers and cause liquid fuel to leak into the crank case. . . ." And in 1973, GM filed with the National Highway Traffic Safety Administration a report which indicated that "the fuel line accumulator welch plug may become dislodged allowing the fuel to siphon from the fuel tank onto the surface under the car when the engine is not running." The report dealt with 685,434 Pontiacs, which, according to GM, were defective and in need of repair.

This evidence is sufficient to support the objective prong of the test for malice. GM knew that siphoning posed a serious risk to automobile passengers. Kirkpatrick admitted that fact. We can infer that GM would not have requested a patent to close a fuel line and prevent siphoning or issued a recall of certain cars to repair a siphoning defect had GM not believed siphoning caused an extreme risk of injury.

GM also claims there is no evidence of the subjective component of a malice finding because there is no evidence that it "knew of a defect and chose not to implement a design change." Specifically, GM argues Iracheta presented no evidence of "even one other 1986–1989 'E' car (similar to the Toronado) involved in a post-collision fuel-fed fire as a result of siphoning from the return line" and "no evidence that GM knew in 1988, when the vehicle was manufactured, that the Toronado would siphon in any condition, including a head-on collision at highway speed."

Iracheta introduced minutes from a July, 1986 meeting of the GM Fuel System Technical Communications Committee. One issue addressed at the meeting was "Fuel Return Anti–Siphon." A notation under that subheading provides "GM10 management continues to insist that an anti-siphon feature is required in the fuel sender return line." The committee minutes reflect that the committee determined that "[s]ince there are no known field incidents of such occurrence nor any evidence that it can even occur on other models, the Committee objects to the GM10 position." GM10 refers to a specific car platform within General Motors. Cars made on that platform are generally referred to as a "W" car. Thomas Green agreed that "for the purposes of the hazard that we're talking about in this case the E car and the W or the GM10 have fuel systems that are substantially similar." Green then went on to detail the similarities. Eventually, according to Green, GM installed a siphon break hole on the fuel return line of W cars. The E cars—Toronados—received the same modification in 1990.

GM documentation reflects that, a little over a week following the meeting discussed above, GM knew about the potential for siphoning fuel. Specifically, that documentation provides:

> The potential for siphoning fuel from the tank via the fuel feed and the fuel return lines on the GM10 has been recognized since 1984. The subject has been the topic of discussion in the fuel systems PDT[10] meetings (which are attended by ACSP) since early 1985. . . . The PDT feels strongly that the anti-siphon must be available for SOP[11] 1988.

> The solution for the return pipe is to either add two .110 inch diameter holes to the pipe directly under the cover to break the siphon or to add a "duck bill" type of one way flow device. . . .

It is uncontroverted that an anti-siphon break hole and a duck bill valve are cost effective and would eliminate any risk of fuel siphoning.

Based on Green's testimony that the fuel systems of the "E" and "W" cars are "substantially similar" and the fact the GM clearly knew that "W" cars would siphon, reasonable minds could differ about whether GM knew the "E" car would also siphon. The parties do not dispute the fact that no anti-siphon device was placed on the 1988 Toronado. This evidence satisfies the subjective prong necessary to a malice finding. Accordingly, the evidence is legally and factually sufficient to support the jury's finding that Edgar's injuries resulted from GM's malice.

### 2. *Federal Standards*

GM argues that "Iracheta's exemplary damages claim cannot be maintained against GM because there is undisputed evidence that the Toronado met and/or exceeded the requirement of FMVSS 301, which relates to fuel system integrity and requires that a vehicle withstand a 30 mph

---

**10.** "Product Development Team."

**11.** "Start of Production."

impact with fuel leakage not to exceed one ounce a minute after rollover." GM cites several cases, many from outside Texas, to support its position. However, none of the cases GM cites categorically supports GM's assertion. First, GM cites *Miles v. Ford Motor Co.*, 922 S.W.2d 572, n. 7 (Tex.App.-Texarkana 1996), *rev'd on other grounds*, 967 S.W.2d 377 (Tex.1998). In *Miles*, the court of appeals recognized that most commentators suggest that compliance with a safety standard should bar liability for punitive damages. The court, however, refused to decide that issue in the case. Instead, the court held that the evidence was insufficient to support the jury's malice finding. GM also cites *Brand v. Mazda Motor Corp.*, 978 F.Supp. 1382 (D.Kan.1997). In that case, the court stated "compliance with federal regulatory standards 'is not dispositive under Kansas law if a reasonable manufacturer would have done more.' Nor does compliance with federal regulatory standards cut off liability for punitive damages when the plaintiff is able to prove by clear and convincing evidence that the manufacturer still acted with 'reckless indifference to consumer safety.' " *Id.* at 1393. The court went on to affirm the summary judgment because there was no evidence of a safer alternative occupant protection system than the one used by Mazda. *Id.* at 1385. Similarly, in *Welch v. General Motors Corp.*, 949 F.Supp. 843, 845 (N.D.Ga. 1996), the court held that in Georgia, punitive damages are not precluded, notwithstanding evidence of compliance with safety standards, if there is other evidence showing culpable behavior.

■ These cases do not support the notion that when a manufacturer complies with safety standards, a plaintiff is completely foreclosed from exemplary damages against the manufacturer, should the jury find it was negligent. Rather the cases suggest that whether a manufacturer complied with federal safety guidelines is *one factor* courts should consider to determine whether the manufacturer acted with malice. We therefore decline to adopt GM's argument that a plaintiff is categorically precluded from recovering damages from a manufacturer for a defectively designed product when the product meets or exceeds federal safety standards.

## CHANGE OF EXPERT OPINION

■ GM next contends the trial court should have struck Sanchez's testimony. In his deposition, Sanchez testified first that, with regard to where siphoning occurred on the vehicle, he could not be any more specific than "the fuel lines between the tank and the area where they come into the engine compartment where they connect to the flex lines at both ends, somewhere between point A and point B." However, he also testified "Personally I feel that it is from the back end simply because the detonation occurred underneath the vehicle at the back end." At trial, Sanchez testified that he believed the rear portion of the return line was compromised.

GM maintains the trial court abused its discretion in failing to strike his testimony in light of the discrepancies between his deposition and trial testimony. TEX.R. CIV. P. 193.6, 195.6; *Aluminum Co. of America v. Bullock*, 870 S.W.2d 2, 4 (Tex.1994). We review a trial court's ruling on a motion to strike for an abuse of discretion. *Guaranty Fed. Savs. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex.1990). Sanchez's statements were not wholly inconsistent. Accordingly, the trial court did not abuse its discretion in refusing to grant GM's motion to strike Sanchez's testimony.

Regardless of the alleged inconsistencies, GM has waived this issue. A party

opposing the admission of evidence must specifically object at the time it is offered to lay a predicate for appellate review of the trial court's action. TEX.R.APP. P. 33.1; *Miles v. Ford Motor Co.*, 922 S.W.2d 572, 591 (Tex.App.-Texarkana 1996), *rev'd in part on other grounds*, 967 S.W.2d 377 (Tex.1998). An objection made after the evidence has been admitted is too late. *Id.*

Sanchez's direct testimony covers 94 pages in the reporter's record. At no time during Sanchez's direct testimony did GM move to strike his opinions. GM's counsel cross-examined Sanchez for an additional 114 pages. GM objected to Sanchez's testimony and moved to strike him as a witness once it completed its cross examination of him. GM contends that it was only at this point that it realized Sanchez's opinions had materially changed, and therefore presented its objections to the trial court. However, early in its cross examination of Sanchez, GM questioned him about the changes in his testimony. Throughout the remainder of its cross examination, GM pointed out to Sanchez and the jury what it perceived to be discrepancies between his trial testimony and his deposition. Accordingly, GM cannot contend that it did not know about Sanchez's change in testimony until the end of cross-examination. GM's objection was untimely and its issue is waived.

## CHARGE ERROR

■ GM asserts the submission of jury question number 3 "precluded a proper comparison of injury causing conduct and injury enhancing conduct."[12] GM further argues the instruction was a comment on the case as a whole because it focused the

jury's attention on whether Silvandria caused Edgar's injuries after the whoosh. We hold GM has not properly preserved this argument for our review.

When an instruction included in the trial court's charge to the jury is defective, the complaining party must make a timely and specific objection pointing out the matter complained of and the ground of the objection. TEX.R. CIV. P. 274; *Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 157 (Tex. 1994); *City of Houston v. Kolb*, 982 S.W.2d 949, 955 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). On appeal, a party must make the same objection to the charge that was made in the trial court or any error is waived. *City of Brady v. Bennie*, 735 S.W.2d 275, 285 (Tex.App.-Eastland 1987, no writ); *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 819 (Tex. App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.).

The question and instruction as presented to the jury is:

Did the negligence, if any, of Silvandria Iracheta proximately cause the injury in question to Edgar Iracheta?

"The injury in question" refers to conscious physical pain and emotional pain, torment and suffering, if any experienced by Edgar after the whoosh, if any?

At the charge conference, GM raised the following objections.

Number 3, jury question number 3, Your Honor. The court will—our objections are as follows: ... I will object to the submission of this issue because it is unnecessary....

---

**12.** GM raises the same complaint with regard to question number 4, which inquired if the negligence of Silvandria Iracheta was a proximate cause of the injury in question to David Iracheta. Because the jury found GM was not liable for David's injuries, and because Iracheta does not appeal the adverse judgment rendered against her for David's injuries, we limit our discussion of GM's issue to the submission of question number 3.

The second part—the second objection that I have to question number 3 is that there is no evidence to submit—to support the submission of the issue with respect to an injury in question as defined by the Court. And third, Your Honor, the definition as stated of injury in question is a comment upon the weight of the evidence.

GM's objections made during the charge conference are not the same as the issues GM raises regarding jury question number 3 on appeal. Accordingly, any error in the question and instruction is waived.

### SILVANDRIA IRACHETA'S NEGLIGENCE

GM contends the jury's failure to find Silvandria Iracheta negligent is against the great weight and preponderance of the evidence. According to GM, Silvandria proximately caused the crash and resulting injury to Edgar. Iracheta agrees with GM's assertion that Silvandria was negligent. However, she points out that in the jury question inquiring whether Silvandria's negligence proximately caused Edgar's injuries, "injury in question" was defined as: "conscious physical pain and emotional pain, torment and suffering, if any, experienced by Edgar after the whoosh, if any." Proximate cause was defined as:

that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

For GM's claim to have merit, we must assume that if a driver can foresee a crash she necessarily must foresee all the consequences that may follow from her car's product design defects. This court cannot make that assumption without usurping the jury's role as factfinder. The jury found GM responsible for all damages to Edgar after the whoosh. That finding is supported by the record.

### JURY ARGUMENT

GM raises on appeal three issues related to improper jury argument: 1) that Iracheta's speech, in Spanish, to the jury constituted a plea for racial solidarity; 2) the lack of a record of the speech amounts to reversible error; and 3) Iracheta's counsel's argument regarding other fuel-fed fires violated the trial court's ruling on a motion in limine.

### A. *Was Iracheta's Speech Incurable Jury Argument?*

During closing argument, Iracheta spoke to the jury in Spanish. The statement was neither translated nor recorded in writing. However, the trial judge noted that Iracheta was "specifically thanking [the jury] for their service." A tape recording of Iracheta's speech was made. The Official Court Interpreter for the 49th Judicial District Court in Webb County interpreted her statement to say: "Thank you very much to the jury on the part of my grandchildren and my daughter and on my part."

GM alleges that "[c]ounsel's intentional solicitation of Ms. Iracheta's Spanish-language statement to the all-Hispanic jury, although perhaps clever, was an impermissible suggestion to the jury that it should feel ethnic solidarity with Ms. Iracheta." GM also maintains that the lack of a record of the statement constitutes reversible error. GM made no objection to Iracheta's speech. Therefore, any claim GM may have regarding Iracheta's speech is waived. And even if Iracheta's speech was

racially motivated, there is nothing in the record to show that the jury was influenced by her comments. *See* Tex.R.App. P. 44.1(a)(1); *Texas Employers' Ins. Ass'n v. Haywood,* 153 Tex. 242, 266 S.W.2d 856, 858 (1954) (reciting "true test for incurability"); *Texas Employers' Ins. Ass'n v. Guerrero,* 800 S.W.2d 859, 865 (Tex.App.-San Antonio 1990, writ denied) (appellant must show probability that improper argument caused harm is greater than probability that verdict based upon proper proceedings and evidence).

### B. *Lack of Record of Speech*

 GM also maintains that because no translator was present when Iracheta made her speech and because the court reporter was unable to transcribe her statements, this court is unable to assess the impropriety of Iracheta's statements to the jury. GM, therefore, argues it is entitled to a new trial. GM failed to object to the lack of an interpreter or of a recording of Iracheta's speech.

GM argues that it did not waive its complaint regarding the lack of a translator at trial because Iracheta bore the burden of requesting an interpreter. GM cites Texas Code of Criminal Procedure, article 38.30 as support for its assertion. The Code of Criminal Procedure does not place the burden of requesting an interpreter on the non-English-speaking party. Rather, either party or the court may move for appointment of an interpreter. Tex.Code Crim. Proc. Ann. art. 38.30(a) (Vernon Supp.2002). Even if the Code of Criminal Procedure did place the onus of requesting an interpreter on the non-English-speaking party, we must presume that the Texas Supreme Court purposefully left a similar provision out of the Rules of Civil Procedure. Accordingly, GM should have requested an interpreter or objected to the lack of one in order to

preserve error. *See* Tex.R.App. P. 33.1(a)(1).

GM further argues that because "Iracheta's statement was not—and could not be—recorded by the court reporter, there can be no appellate review of the impropriety of her statement; therefore, this Court should reverse and remand for a new trial." GM's complaint is similar to one where a party claims a record of trial proceedings was somehow lost or destroyed. Texas Rule of Appellate Procedure 34.6(f) provides:

An appellant is entitled to a new trial under the following circumstances:

(1) if the appellant has timely requested a reporter's record;

(2) if, without the appellant's fault, a significant exhibit or a significant portion of the court reporter's notes and records has been lost or destroyed ...

(3) if the lost, destroyed or inaudible portion of the reporter's record, or the lost or destroyed exhibit, is necessary to the appeal's resolution; and

(4) if the parties cannot agree on a complete reporter's record.

Here, GM neither objected to the reporter's inability to record Iracheta's statement nor requested that the reporter record the statement. And further, even though Iracheta's statement was not recorded at the moment she spoke, the trial judge noted on the record that she was thanking the jury for their service, and the official interpreter filed an interpretation of the statement with the trial court. Accordingly, the content of Iracheta's statement is before us, allowing this court to review the propriety of the statement. GM has made no showing that her speech was harmful. *Issac v. State,* 989 S.W.2d 754, 757 (Tex.Crim.App.1999) ("necessary to the appeal's resolution" language is itself harm analysis). Accordingly, GM is

not entitled to a new trial based on the lack of a record of Iracheta's Spanish statements to the jury. *Lascurain v. Crowley*, 917 S.W.2d 341, 344–45 (Tex. App.-El Paso 1996, no writ) (where witness testifies in absence of reporter and appellant fails to object, appellant not entitled to a new trial).

## C. *Improper Jury Argument Regarding Other Accidents*

■ GM also contends that Iracheta's counsel, in an attempt to explain GM's use of anti-siphoning devices on its fuel systems, improperly argued to the jury that "between 1988 and 1990 there were people that started to burn to death and people that started to get hurt and killed." GM asserts this statement was a violation of the trial court's ruling on GM's motion in limine and that the argument injected new and harmful facts without establishing the proper predicate.

At trial, GM objected to the argument, stating "I object. Counsel is not allowed to speculate. He can only argue the evidence and the evidence that's presented. There's been no evidence presented of that speculation." GM's objection was insufficient to preserve any complaint that Iracheta violated the motion in limine. *See Weidner v. Sanchez*, 14 S.W.3d 353, 364–64 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *Davis v. Stallones*, 750 S.W.2d 235, 237 (Tex.App.-Houston [1st Dist.] 1987, no writ) (unless proper, timely objection is made when an improper question has been asked in violation of motion in limine, error is waived).

GM's objection was sufficient to give the trial court notice of its complaint that the evidence did not support Iracheta's counsel's argument. Yet to obtain reversal of a judgment on the grounds of improper jury argument, GM must prove: (1) an error; (2) that was not invited or provoked; (3)

that was preserved at trial; and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex.1979). Essentially, GM must prove that the probability the improper argument caused harm is greater than the probability that the verdict was based upon the proceedings and the evidence. *Texas Employers' Ins. Ass'n v. Guerrero*, 800 S.W.2d 859, 865 (Tex.App.-San Antonio 1990, writ denied).

The record does not support Iracheta's counsel's statements. Thus, the statement was error. There is nothing in the record, nor does Iracheta contend, that the error was invited or provoked. The error, however, was not preserved. After GM objected to the statement, the trial court did not expressly rule on the objection. TEX. R.APP. P. 33.1(a)(2). Rather, the trial court instructed the jury that "what the lawyers tell you now is not evidence. It is argument. They are allowed to draw reasonable inferences from the evidence that was presented, but you are the ultimate triers of fact." Assuming the error was preserved and the trial court's instruction was not strong enough to cure the error, GM has not shown that the one statement in closing argument changed the outcome of the trial. Thus, the error is harmless.

### BATSON/EDMONSON

GM complains that Iracheta's use of her peremptory strikes violated *Batson v. Kentucky*. In *Batson v. Kentucky*, the United States Supreme Court declared that racially motivated use of peremptory challenges in criminal cases violates due process of law and requires reversal. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Edmonson v. Leesville Concrete Co., Inc.*, the Court extended the reach of *Batson* to civil trials. 500 U.S.

614, 630–31, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). Resolution of a Batson/*Edmonson* challenge involves a three-step process: (1) the opponent of the peremptory challenge must establish a prima facie case of racial discrimination; (2) the party who exercised the strike must provide a race-neutral explanation; and (3) if the striking party does so, the party challenging the strike must prove purposeful racial discrimination. *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Goode v. Shoukfeh,* 943 S.W.2d 441, 445 (Tex.1997). The issue of whether a race-neutral explanation should be believed is a question of fact for the trial court. *Goode,* 943 S.W.2d at 446. We review the trial court's determination for an abuse of discretion. *Id.* at 491.

GM maintains that Iracheta's race-neutral explanations for striking venire persons 7 and 9 were pretextual and did not disprove her discriminatory exercise of her peremptory strikes.

### A. *Venire Person 7*

■ GM objected to Iracheta's use of a peremptory strike on venire person 7, claiming she was stricken for ethnic reasons. Iracheta's trial counsel testified that they struck venire person 7 because: 1) she writes for a periodical; 2) she is extremely opinionated; 3) her answers to questions were nonresponsive; 4) as a former college professor "she leads the thought of the people in the room;" and 5) she has worked with metals in the past.

GM argues that each of Iracheta's reasons are pretextual because there were other venire persons with characteristics similar to venire person 7's who were not stricken from the panel and because Iracheta's reasons are not supported in the record. For example, venire person 7 possessed knowledge of metallic melting points. GM contends that five other jurors had extensive experience with diesel or automotive fuel systems and were, nevertheless, retained on the jury. Although each of these panel members may have some experience with or knowledge of fuel systems, that knowledge or experience is not "extensive." [13] GM also argues that two other panel members were educators, but were not stricken from the panel and that Iracheta never asked venire person 7 about her opinions. However, Iracheta's counsel testified that he knew venire person 7 was opinionated because he has read her newspaper column for several years.

Based on the reasons offered by Iracheta's counsel, we hold the trial court did not abuse its discretion in determining Iracheta's reasons for striking venire person 7 were race-neutral.

### B. *Venire Person 9*

■ GM also objected to Iracheta's use of a peremptory strike on venire person 9. Iracheta, however, argues that she struck venire person 9 because she is related, by marriage, to a member of one of the firms involved in the case, and that the firm took care of a land transaction venire person 9 was involved in. Furthermore, Iracheta's counsel had known venire person 9 for years, was in the same fraternity as her

---

13. Panel member # 3 worked at a diesel truck stop and observed trucks refueling. Member # 5 is an auto mechanic who never worked on fuel systems or fuel lines. He did, however, replace filters on gasoline tanks. He was also familiar with the differences between carbureted and non-carbureted cars. Panel member 17 knows that on forklifts, hoses are connected from the fuel tank to the carburetor. He was also familiar with feed and return lines and knew of at least one occasion where a rubber hose broke and leaked gasoline. Member # 29 indicated that he had siphoned fuel from a gas tank before, but that he had no other experience with fuel systems or fuel lines.

son, and knew her other son, who had been killed in a car accident. He further testified that he struck venire person 9 because he "did not want to put her through that kind of thing, reliving that situation." The trial court did not abuse its discretion in determining Iracheta's reasons for striking venire person 9 were race-neutral.

### CONCLUSION

We hold there is sufficient evidence to support the jury's finding that a design defect existed in the fuel system of GM Toronado Edgar Iracheta was riding in. Furthermore, the evidence is sufficient that the defect caused a fuel-fed fire, which caused Edgar to suffer conscious pain and suffering and that the damages Edgar suffered were a result of GM's malice. In addition, we hold that none of the remaining errors alleged in GM's brief amounts to reversible error. Accordingly, we affirm the trial court's judgment.