IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF 
TEXAS
 
════════════
No. 02-0932
════════════
 
General Motors Corp., 
Petitioner,
 
v.
 
Rita L. Iracheta, Administrator 
of the Estates of
David Iracheta, Deceased, 
and Edgar Iracheta, 
Deceased,
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Fourth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued 
September 25, 
2003
 
 
Justice Hecht delivered the opinion of 
the Court.
 
Chief Justice Jefferson and Justice Green did not participate in 
the decision.
 
Silvandria Iracheta was driving a 
1988 General Motors Oldsmobile Toronado on a two-lane 
highway near Laredo just after noon 
on a clear day when she suddenly veered across the center line into an oncoming 
18‑wheeler at a closing speed of over 100 m.p.h. The truck rolled over the car, 
ripping off its hood and roof, and severely damaging its left side. The 
collision ruptured the truck’s fuel system, splattering diesel over both 
vehicles that exploded in flame. Several minutes after the car came to rest at 
the side of the road, a second fire exploded, this one fueled by gasoline from 
the car. Silvandria died instantly in the collision, 
and her four-year-old son David, seated in the back, may have as well. Her other 
passenger, nine-year-old son Edgar, belted in the passenger seat, remained 
conscious and died in the second fire.
The boys’ 
grandmother, Rita L. Iracheta, sued General Motors 
Corporation on behalf of their estates.[1] 
(The boys’ father could not be found to bring a wrongful death action.)[2] 
A jury failed to find that Silvandria’s negligence 
caused the boys’ deaths and found instead that Edgar’s death, but not David’s, 
was caused by a design defect in the car which allowed gasoline to siphon from 
the fuel system. The jury found Edgar’s pain and anguish damages to be $10 
million. The trial court rendered judgment on the verdict, only General Motors 
appealed, and the court of appeals affirmed.[3]
In this 
Court, General Motors raises a number of issues, one of which, we conclude, is 
dispositive: there is no evidence that the second fire 
was caused by the defect in the Toronado. Accordingly, 
we reverse the judgment of the court of appeals and render judgment for General 
Motors.
Iracheta’s proof of causation rests on the testimony of two 
expert witnesses. One, Eduardo Sanchez, testified on the origins and causes of 
the fires resulting from the collision. The diesel from the truck’s ruptured 
fuel system, he said, exploded on impact in a fireball that, although intense, 
lasted only the few seconds it took for the Toronado 
to skid down the highway to a stop. Consistent with the accounts of the truck 
driver and two other men at the scene, Sanchez testified that after this first 
flash fire, small spot fires broke out and continued to burn in the car’s engine 
and passenger compartments and in the grass around the vehicle for about ten 
minutes, more or less. The three men approached the vehicle and tried to free 
Edgar, who was screaming in pain in the front seat, but the car was too hot for 
them to reach inside. Suddenly, they heard what they described as a “whoosh” 
sound at the rear of the vehicle, and the second fire exploded, fueled by 
gasoline from the car. Although the gas tank had remained intact, Sanchez 
testified that gasoline leaked from the fuel system onto the ground for several 
minutes until the vapors ignited.
Determining 
whether the car’s fuel system could leak was not, according to Sanchez, 
within the scope of his expertise. For that, he said, he relied on Iracheta’s other expert, John Stilson, a mechanical engineer with experience in accident 
reconstruction. Stilson testified that gasoline could 
leak or siphon from the fuel tank only through a return line that ran from the 
engine along the left side of the car to the tank. The line was made of steel 
tubing and did not rupture in the collision, but it was attached on one end to 
the engine and on the other to the tank by short, flexible rubber hoses that 
were both found to have burned away at some point. Tests Stilson conducted on a similar vehicle showed that when the 
car was inclined toward the front, as Iracheta’s was 
when it came to rest off to the side of the highway, gasoline would siphon out 
of the tank onto the ground if either the front hose or the rear hose was 
opened. This condition, Stilson testified, was a 
design defect in the car.
Although 
Stilson found that gasoline would siphon from the 
return line at either end, depending on where the breach occurred, Iracheta concedes that she had to prove that gasoline leaked 
at the rear of the car rather than the front, since all of the witnesses present 
at the scene testified that the “whoosh” and the second fire came from the rear, 
and Sanchez testified that the fire could not have happened as it did if 
gasoline had not siphoned at the rear. Furthermore, Iracheta concedes that she was required to prove that the 
rear hose was severed or torn in the impact before it burned; otherwise the 
gasoline escaping from the burning hose would have been ignited immediately by 
the flame and there would never have been the “whoosh” sound that everyone 
present heard. As Iracheta’s counsel explained at oral 
argument:
 
JUSTICE: You do have to show siphoning occurred at the rear to 
get causation here on this record, because it would be inconclusive if there 
were only siphoning at the front?
 
COUNSEL: We have to present evidence that a jury could 
reasonably find that the siphoning caused a spill at the rear of the car, 
yes.
 
JUSTICE: Does it matter how the rear opened up? Does it matter 
whether it burned through or whether it was caused by the 
collision?
 
COUNSEL: I think it may, and the reason for that is the 
“whoosh”. Again, it comes back to: how did this car suddenly, after several 
minutes C 
from 10 to 20 minutes C 
become engulfed in this cloud of flames that ultimately killed Edgar Iracheta? If the line burned, there could have been just a 
jet stream of flame like at the end of a welding torch, which might not create 
that “whoosh”. And here the spill at the rear C 
where there was no immediate fire, or no testimony that there was any immediate 
fire, falling on the ground C 
creating a vapor that spread until it found an ignition source and then exploded 
C 
is what Mr. Sanchez’s testimony establishes. Also the eyewitnesses C 
they were at the vehicle, and that’s why this is not a circumstantial evidence 
case altogether C 
testified that the fire came from the rear, the “whoosh” came from the rear. And 
Mr. Sanchez in his investigation in reaching his conclusions talked to all of 
those eyewitnesses, talked to Stilson, observed the 
replica of the car, observed the car itself, the damage that went all down the 
side of the car, including the rear where the rear hose was broken, and that’s 
how he came to his opinion that the rear hose was broken and that’s where it 
siphoned.
 
The 
difficulty is that there are significant conflicts in and between the testimony 
of Sanchez and Stilson, each stressing both the extent 
and the limits of his own expertise and that of the other. Stilson testified that his assignment in the case was to 
determine exactly where gasoline leaked or siphoned from the Toronado fuel tank,[4] 
and that he took it upon himself to make that determination.[5] 
This, he stated, was his area of expertise, not Sanchez’s.[6] 
Stilson testified that gasoline siphoned at the front 
of the return line[7] 
and did not siphon at the rear.[8] 
The rear hose on the return line, he said, was not injured in the collision but 
burned away in the fire.[9]
Sanchez 
testified at his deposition that he could not say where the leak in the return 
fuel line occurred,[10] 
that he was unable to establish whether the line had been compromised at 
impact,[11] 
that he was not an expert on that subject, and that he would leave the 
determination to someone else.[12] 
At trial, however, Sanchez was “100 percent” certain that the leak occurred at 
the rear of the car[13] 
and not at the front.[14] 
For one thing, he said, there was no evidence of intensified fire in the 
front,[15] 
and for another, a leak at the front of the car could not have caused the 
“whoosh” at the rear.[16] 
Furthermore, Sanchez stated, he had been told by Stilson that gasoline siphoned from the rear hose because it 
was damaged by the impact of the two vehicles.[17] 
But later in his testimony, Sanchez admitted that Stilson had told him many times the rear hose had burned 
through, not that it broke from the impact of the two vehicles.[18] 
Sanchez stated that it was impossible for the rear hose to have burned through 
because gasoline in the hose would have been ignited immediately, without the 
delay and the “whoosh” sound.[19] 
He was “100 percent” sure of this, too.[20] 
Yet at another point he testified that where the leak occurred was immaterial 
because fires inside the car and in the surrounding grass could have ignited the 
gasoline vapors.[21] 
The internally conflicting nature of Sanchez’s testimony is perhaps best 
illustrated in the following answers to questions by Iracheta’s counsel within four minutes of each other at 
trial (as indicated in the reporter’s record):
 
Q         
I’ve written up here, sir, the question: where did the line siphon? And 
I’m referring to the return line. That is a question that you have given an 
answer to in this case, correct?
 
A         
That’s correct.
 
Q         
Would you tell us your understanding of whether or not that was Mr. Stilson’s area of expertise for purposes of this 
case?
 
A         
Yes, it was.
 
*     *     
*
 
Q         
So although Mr. Stilson was asked his opinion 
in the case with regard to the question of where did the return line siphon, 
would you tell the jury is that your area to answer?
 
A         
That is my area of expertise.
 
To support 
his opinion that gasoline siphoned from the rear hose, Sanchez offered simply 
that he had excluded the only other possibility,[22] 
which was that gasoline or vapors from the filler neck (where gasoline is pumped 
into the tank) ignited. He believed that vapor from the tank would be too 
lean,[23] 
and that the gasoline in the tank would have had to boil out onto the ground 
before it could ignite, which it was not hot enough to do.[24] 
Sanchez asserted that the grass fires were not hot enough to have caused 
gasoline or vapors to escape from the filler neck and ignite,[25] 
even though he had testified that those same fires could have ignited any 
gasoline leak, and despite the unchallenged testimony of the eyewitnesses that 
fires in and around the car made it too hot to approach. Sanchez also asserted 
that the initial flash fire was too short in duration to heat the fuel tank.[26] 
Sanchez cited no testing or other basis for these opinions.
Confronted at 
trial by Sanchez’s testimony the previous day, Stilson 
stated that while he still believed that the rear hose had burned away, instead 
of being severed in the impact, his was only “one explanation”.[27] 
Although Stilson continued to insist that the return 
fuel line siphoned at the front of the car, contrary to what Sanchez had said, 
he would not “take exception” with Sanchez that siphoning at the rear was a 
“possibility”.[28]
The court of 
appeals concluded that “Sanchez was not qualified to render an opinion regarding 
where the siphoning actually occurred”,[29] 
and further, that “[n]othing in the record shows 
Sanchez’s engineering opinion C 
that the fuel line ruptured in the rear end of the car C 
is reliable.”[30] 
The court nevertheless concluded that “there is legally sufficient evidence to 
support a finding that the Toronado’s fuel system 
failed during the crash”,[31] 
namely:
 
Stilson’s opinion that the front rubber hose of the return line failed 
in some manner; Stilson’s opinion that one explanation 
for a compromise in the rear hose is that it burned away; and [General Motors’ 
expert’s] opinion that the hoses did not rupture.[32]
 
But none of 
this evidence supports a finding that a fuel system failure resulted in the 
second fire. There is no evidence that the second fire could have been caused by 
a failure of the front hose or the burning of the rear hose; indeed, Sanchez’s 
testimony was exactly the opposite. The court’s cite to General Motors’ expert’s 
testimony in this context is difficult to understand, since it directly 
contradicts Iracheta’s theory that the rear hose was 
ruptured by the impact. The court of appeals added:
 
Problematically, Stilson theorized 
that the return line[] opened near the front of the vehicle as a result of the 
initial impact, but Sanchez determined that the fire detonated near the 
vehicle’s rear. Although this conflict may appear to be fatal to Iracheta’s claim, Sanchez recognized that there might be a 
conflict between his theory and Stilson’s. 
Specifically, Sanchez stated: “But it could have been either/or, it’s 
immaterial, the gasoline is out of that environment, out of the contained fuel 
system. Whether it did leak in the front or whether it leaked in the back is 
immaterial in my opinion.”[33]
 
We agree with 
the court of appeals that the conflict between Stilson 
and Sanchez appears fatal to Iracheta’s claim, but we 
do not agree that the conflict can be avoided by Sanchez’s bare assertion that 
“it’s immaterial”. Undisputedly, gasoline could have siphoned from the return 
fuel line at both the front and the rear. Tests proved that. But there is no 
evidence that siphoning at the front could have caused the second fire in the 
way every witness testified it occurred. Indeed, Sanchez himself testified that 
siphoning at the front could not have caused the second fire.[34] 
For Sanchez to characterize his conflict with Stilson 
as “immaterial” is contradicted by their testimony.
We agree with 
the court of appeals that Sanchez was not qualified to testify. It was Iracheta’s burden to establish Sanchez’s qualifications.[35] 
Sanchez and Stilson both testified that Sanchez was 
not qualified to offer an opinion on where the siphoning occurred. Although both 
also equivocated on the subject, experts cannot be as ambivalent as these two 
were and establish the privilege of offering opinion testimony under Rule 702 of 
the Texas Rules of Evidence.
Furthermore, 
while Sanchez did assert that gasoline siphoned from the return fuel line at the 
rear of the car, the only support he offered for this opinion was that he had 
eliminated all other possibilities. He eliminated the obvious possibility that 
fuel or vapors from the tank filler neck ignited only by saying so, offering no 
other basis for his opinion. Such a bare opinion was not enough. Just last year 
we wrote:
 
We noted in Burrow v. Arce 
that, although expert opinion testimony often provides valuable evidence in a 
case, “it is the basis of the witness’s opinion, and not the witness’s 
qualifications or his bare opinions alone, that can settle an issue as a matter 
of law; a claim will not stand or fall on the mere ipse dixit of a credentialed witness.” Burrow v. Arce, 997 S.W.2d 229, 235 (Tex. 1999). Opinion testimony 
that is conclusory or speculative is not relevant 
evidence, because it does not tend to make the existence of a material fact 
“more probable or less probable.” See Tex. R. Evid. 
401. This Court has labeled such testimony as “incompetent evidence,” and has 
often held that such conclusory testimony cannot 
support a judgment. Cas. Underwriters v. 
Rhone, 134 Tex. 50, 132 S.W.2d 97, 99 (1939) (holding that a witness’s 
statements were “but bare conclusions and therefore incompetent”); see 
also Wadewitz v. Montgomery, 951 
S.W.2d 464, 466 (Tex. 1997) (“[A]n expert witness’s conclusory statement . . . will neither establish 
good faith at the summary judgment stage nor raise a fact issue to defeat 
summary judgment.”). Furthermore, this Court has held that such conclusory statements cannot support a judgment even when no 
objection was made to the statements at trial. Dallas Ry. & Terminal Co. v. Gossett, 156 Tex. 252, 294 
S.W.2d 377, 380 (1956) (“It is well settled that the naked and unsupported 
opinion or conclusion of a witness does not constitute evidence of probative 
force and will not support a jury finding even when admitted without 
objection.”); Rhone, 132 S.W.2d at 99 (holding that “bare conclusions” 
did not “amount to any evidence at all,” and that “the fact that they were 
admitted without objection add[ed] nothing to their probative force”); see 
also Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 712 (Tex. 1997) (“When the 
expert ‘brings to court little more than his credentials and a subjective 
opinion,’ this is not evidence that would support a judgment. . . . If 
for some reason such testimony were admitted in a trial without objection, would 
a reviewing court be obliged to accept it as some evidence? The answer is 
no.").[36]
 
Thus, even if 
Sanchez had been qualified to testify about where gasoline leaked, none of his 
opinions rise to the level of competent evidence.
Moreover, 
Sanchez’s testimony was rather clearly unreliable. It had no basis outside his 
own assertions, which were irreconcilably self-conflicting. A fair view of his 
testimony is that he was willing to say almost anything, directly contradicting 
himself.[37] 
Iracheta argues that General Motors waived any 
complaint regarding the reliability of Sanchez’s testimony by waiting until the 
end of cross-examination to object. But the utterly conflicting nature of 
Sanchez’s testimony was not fully apparent until cross-examination. Indeed, the 
conflict in his testimony regarding his and Stilson’s 
respective expertise did not occur until redirect. The unreliability of expert 
opinions may be apparent as early as the discovery process but also may not 
emerge until trial, during or after the expert’s testimony, or even later. An 
objection must be timely, but it need not anticipate a deficiency before it is 
apparent. Here we cannot say that General Motors’ objection following 
cross-examination came too late.
Apart from 
Sanchez’s testimony, only Stilson’s could support the 
verdict, and it falls short. In Stilson’s view, the 
rear hose on the return fuel line burned away. But as Sanchez demonstrated, the 
fire that burned the hose would also have ignited the gasoline siphoning through 
it, resulting in a fire like a “welding torch” (counsel’s description at oral 
argument), not the “whoosh” that the eyewitnesses all heard. Stilson conceded that injury to the rear hose from the 
impact was a “possibility” and was willing to “defer” to Sanchez on the matter. 
But as we have shown, Sanchez offered no competent opinions on the subject to 
which Stilson could defer, and the mere possibility 
that the rear hose was compromised at impact is not enough to support the jury’s 
findings.
Iracheta attempts to borrow from each of her experts pieces 
of opinion that seem to match, tie them together in an ill-fitting theory, 
discard the unwanted opinions, disregard the fact that the experts fundamentally 
contradicted themselves and each other, and then argue that this is some 
evidence to support the verdict. Inconsistent theories cannot be manipulated in 
this way to form a hybrid for which no expert can offer support. [38] 
We therefore conclude that there is no evidence that the siphoning defect in the 
Toronado caused the second fire in which Edgar died. 
Accordingly, Iracheta is not entitled to recover 
against General Motors.
We are 
obliged by one highly unusual occurrence during summation to add this additional 
note. Rising to begin his argument to the jury, Iracheta’s counsel stated: “Mrs. Iracheta has asked for the opportunity simply to stand and 
thank you for your time as well.” Immediately, without leave of court or notice 
to opposing counsel, Mrs. Iracheta stood and said to 
an all-Hispanic jury: “Muchas gracias les 
doy de parte de mis nietos y mi hija y de parte mia la jurado.” (“Thank you 
very much to the jury on the part of my grandchildren and my daughter and on my 
part.”) General Motors understandably did not interpose an objection at once but 
waited until after Iracheta’s counsel had finished his 
argument, and then moved for a mistrial at the bench. The court denied the 
motion.
The court of 
appeals concluded that General Motors’ objection was untimely.[39] 
We disagree. In these most unusual circumstances, General Motors’ counsel was 
not required to object to a grandmother’s expression of appreciation on behalf 
of her deceased daughter and deceased grandchildren, thereby risking the jury’s 
ire, and it is entirely impractical to think otherwise. At oral argument in this 
Court, Iracheta’s counsel concedes that it was 
improper for Mrs. Iracheta to address the jury but 
argues that the error was harmless. We think the harm is manifest to any 
experienced trial lawyer. A party’s personal expression of gratitude to the jury 
at the close of a case is error that cannot be repaired and therefore need not 
be objected to.[40]
*     
*     *     *     *
Accordingly, 
we reverse the judgment of the court of appeals and render judgment that Iracheta take nothing. 
 
 
                                                                             

Nathan L. Hecht
Justice
Opinion 
Delivered: April 8, 
2005




[1] See Tex. 
Civ. 
Prac. & Rem. Code ' 71.021.

[2] See id. ' 71.004(a) (stating that a wrongful death action 
“is for the exclusive benefit of the surviving spouse, children, and parents of 
the deceased”).

[3] 90 S.W.3d 725 (Tex. App.CSan Antonio 2002).

[4] “Q        In 
this case, were you asked to determine the exact location of where this 
particular Toronado siphoned fuel?  In other words, if you assume the return 
line C 
 
“A           
Yes.  I 
understand.
 
“Q           
Were you asked to identify for purposes of your expert testimony in this 
case where that happened?
 
“A           
Yes.  That was my assignment 
in this particular case, that I was requested to evaluate the design 
C not just for siphoning, but to find out whether or not 
this system leaked gasoline, number one, and number two, whether it should 
have.  That’s what I took on for a 
task.”

[5] “Q        Mr. 
Stilson, for purposes of this case, did you take it 
upon yourself to try to determine where exactly on the return line the opening 
occurred in the Iracheta 
accident?
 
“A           
Yes.”

[6] “Q        
. . .  You didn’t 
say, ‘That’s not my area, go talk to Ed Sanchez,’ did you?
 
“A           
Not as far as siphoning and where the lines were compromised, no.  I never assign that to anybody but 
me.
 
“Q           
So where it siphoned and where it compromised was your 
area.
 
“A           
My area.”

[7] “Q        
Okay.  Now . . . 
you believe . . . that there was siphoning out of the return line at 
the front end as the vehicle was at rest, correct?
 
“A           
That is correct.
 
“Q           
All right.  And that’s what 
you believe now; is that correct?
 
“A           
Yes, I do.”

[8] “Q        
. . .  Second, 
. . . did you testify that the leakage did not come from the hoses at 
the back of the tank because they were not compromised in the 
collision?
 
“A           
In my deposition, that’s what I have stated.
 
“Q           
All right.  And that’s your 
opinion?
 
“A           
That’s my opinion.”

[9] “Q        
[Question from your deposition:] ‘Do you believe that the elastomeric hose for the return line back at the tank was 
burned away?’  ‘Answer: 
Correct.’  ‘Question: I mean, it 
didn’t suffer collision-related damage that caused it to separate?’  And your answer was 
what?
 
“A           
Yes.
 
“Q           
‘That is correct’?
 
“A           
‘That is correct.’”

[10] “Q       [Question 
from your deposition:] ‘With regard to where you believe the siphoning occurred, 
you’re saying somewhere I believe between the carburetor, or where the fuel 
enters the engine, and the tank.  Is 
there any more specificity you can give me other than that?’  And your answer, sir, was, ‘No, 
sir.  I cannot.  The fuel lines between the tank and the 
area where they come into the engine compartment, where they connect to the flex 
lines at both ends, somewhere between point A and point B, I can’t be more 
specific than that.’  That’s what 
you told us, right?
 
“A           
That’s correct.”

[11] “Q       Question 
[from your deposition]: ‘When you say “compromise,” were you able to pinpoint 
through the fire patterns or any of your investigation a location of compromise 
[of the fuel line] or are you assuming compromise because of damage to the 
vehicle?’
 
“A           
Answer C
 
“Q           
And you answer was?
 
“A           
The answer was: ‘I am unable to establish which line was compromised or 
whether it was compromised at impact.’”

[12] “Q       Okay.  Didn’t you say [in your deposition] that 
you don’t know where the siphoning was, that you’re not an expert, you leave 
that to someone else, and that it was somewhere between point A and point B on 
that line which was all the way from the engine to the gas 
tank?
 
“A           
That’s correct.  And I 
answered [opposing counsel] on about four different times.  He kept asking me and then he jarred my 
memory.  And . . . I 
attempted to explain this process that I’m covering 
here.”

[13] “Q       Well, today 
you’re saying I can be more specific than that because you’re saying I know 100 
percent it was in the back at the tank on this hose.  You now know that 100 percent 
today.
 
“A           
That’s correct.”

[14] “Q       You have 
ruled out any leak up front which caused the ‘whoosh’.  Is that a correct 
statement?
 
“A           
Yes.  
Correct.
 
“Q           
So I’m going to write down, number one, ruled out 100 percent.  Fair?
 
“A           
Fair.”

[15] “Q       There is no 
evidence of a fire C or intensified fire C at the engine compartment?  That’s your 
testimony?
 
“A           
That C 
 
“Q           
That’s your testimony?
 
“A           
Yes.”

[16] “Q       If it [that 
is, the metal return line] is not crimped [up front in the engine compartment], 
you might be wrong [about whether the line leaked there], 
right?
 
“A           
I might be wrong that it is not crimped.  I might be wrong that we didn’t have a 
siphoning.  The siphoning at that 
end does not create the ‘whoosh’ under the car at the opposite end of the 
car.”

[17] “Q       All 
right.  My question to you is 
though: As far as the location of the siphoning, it occurred there [at the rear 
hose near the fuel tank] because Mr. Stilson told you 
that.  And that is an integral part 
of your opinion.
 
“A           
Certainly.
 
*          
*          
*
 
“Q           
At impact, this terrific impact knocked off this rubber hose and the car 
came to rest and that’s where it siphoned in the back.  And that’s what Mr. Stilson told you.
 
“A           
That’s basically what conclusion I reached as well based on all the 
information that I got.
 
“Q           
But my question is that’s what C as you’ve told us before C that’s what Mr. Stilson told 
you and that’s what you used because you’re not an engineer and you can’t say it 
didn’t happen.
 
“A           
That’s correct.
 
*          
*          
*
 
“Q           
I just want to make sure that’s what Mr. Stilson told you.
 
“A           
Yes, sir.  Essentially that’s 
what he told me.”

[18] “Q       
. . .  Did Mr. 
Stilson tell you it was his engineering opinion that 
that rubber hose [at the rear near the tank] broke upon impact of the two 
vehicles?
 
“A           
He told me that it burned.
 
“Q           
That’s right.  He told you 
that many times, didn’t he?
 
“A           
And I told C yes, sir, he did.”

[19] “Q       It’s 
impossible because if it [that is, the rear hose] burned through, as Mr. Stilson says, you would have had a fire immediately, 
wouldn’t you?
 
“A           
Yes, sir.  
Correct.
 
“Q           
I mean, you can’t burn through a hose full of gas without having a fire, 
can you?
 
“A           
If it is, in fact, full of gas at the time, yes, 
sir.
 
“Q           
Well, under your theory it’s siphoning, so it has to be.  Right?
 
“A           
It siphons when the line is open, sir.
 
“Q           
But under your theory, if it’s burned through, you would have had a fire 
right there immediately, right?
 
“A           
Yes.
 
“Q           
Okay.  So you’re going to 
rule out 100 percent that the ‘rear hose on the return line at the tank burned 
through prior to siphoning.’  
Right?
 
“That’s correct.”

[20] “Q       But you can 
tell for sure C you are 100-percent certain C that this rubber hose [at the rear] was thrown off at 
impact, aren’t you?
 
“A           
It would have to have been compromised.
 
“Q           
You are 100-percent certain, aren’t you?
 
“A           
I am conclusive on that, yes.”

[21] “Q       You say [in 
your deposition regarding where the siphoning occurred], ‘At some point from the 
front end of the feed and/or the return line to the lower end of the tank.’  And then you say, ‘Personally, I feel 
that it is from the back end simply because the detonation occurred underneath 
the vehicle at the back end.’  You 
told [Stilson] that, correct?
 
“A           
Correct.
 
“Q           
And then you continue and you say, ‘But it could have been 
either/or.  It’s immaterial; the 
gasoline is out of that environment, out of the contained fuel system.  Whether it did leak in the front or 
whether it leaked in the back is immaterial in my opinion.’  Correct?
 
“A           
That’s correct.
 
“Q           
All right, sir.  Now can you 
explain to us why C explain first of all what that answer 
means?
 
“A           
Essentially the question here is why is the fuel out of the C or confined fuel system.  That is the question.  The question is not what detonated it or 
what ignited it because there were a multitude of things around there.  Fire in the grass around it, there were 
fires in the engine area, there were fires in the dashboard area, fires on the 
C in the interior cab.  And that’s why I mention that it’s 
immaterial.  The question here is 
why did the fuel get out of the enclosed fuel system and how did it get 
out.  That’s what I’m addressing 
there.”

[22] “Q       All right, 
sir.  Have we then eliminated all 
the potential candidates for where the gasoline might have siphoned out of this 
tank other than one?
 
“A           
That’s correct.
 
“Q           
And what is the one, then, that you conclude is the true source of the 
siphoning?
 
“A           
Return line.  Siphoning 
through the return line at the rubber connections.
 
“Q           
At which rubber connection, sir?  
You’ve identified two.
 
“A           
At the tank.”

[23] “Q       Okay.  So why was there not enough vapor to 
escape from the filler neck to have created this ‘whoosh”?
 
“A           
Because it’s not going to be a sufficient quantity of vapors.  It’s going to be very lean.  It’s going to be under the lower 
explosive limits of gasoline . . . .”

[24] “Q       Yes, 
sir.  To generate the vapors 
sufficient to have them go out of the filler neck, what do you 
need?
 
“A           
The fuel is going to have to be on the ground.  It’s going to hit the soil.  It’s going to be absorbed by the soil 
C 
 
“Q           
I’m talking about the filler neck, sir.
 
“A           
From the filler neck.  It 
would have to boil over, fall to the ground C exit the tank, fall to the ground, and vaporize on the 
ground to have the amount of vapors that we had to cause this violent 
reaction.
 
“Q           
Was the fuel boiling?
 
“A           
No, not in my opinion.  There 
was no C there was no intense heat of any duration to cause 
that.
 

[25] “Q       Even if 
there had been some grass burning right underneath the tank, given the 
conditions of that grass out there, the wind, and other matters out there, all 
the evidence together, would it have been sufficient to boil the gasoline in 
this tank?
 
“A           
In my opinion, no.
 
“Q           
Not a chance?
 
“A           
Not a chance, no.”

[26] “A       
. . .  The same 
thing happened in the flash fire at impact.
 
“Q           
With the gas tank?
 
“A           
With the gas tank.  Why?  Because it lasted for a matter of 
seconds, number one.  Number two, 
the tank is protected by the vehicle because it’s underneath.  So in my opinion there was not enough 
time to transfer heat from that fireball or flash fire on the tank to bring it 
to a boil-over.”

[27] “Q       Did you 
ever offer an opinion, Mr. Stilson, regarding what you 
think might have caused the rear hose to open in this 
accident?
 
“A           
Yes.
 
“Q           
And what was your opinion, sir?
 
“A           
My opinion was and is that one explanation for the opening of that rubber 
hose was it was burned away by the fire.  
That’s one explanation.  
Because it’s burned away right now.  
The remnant of the return line hose from the connection at the steel that 
goes back up to the tank down to where it connects to the underbody hose, it 
goes C or line that goes forward to the engine, that 
transition of rubber hose is all burned away right now.  So I know it burned away at some 
point.”

[28] “Q       So Mr. 
Sanchez has ruled out any leak up front, and you disagree with 
that?
 
“A           
Yes.  I don’t think that is 
correct.
 
“Q           
And Mr. Sanchez has ruled out that the return lines were burned up, and 
you don’t agree with that either?
 
“A           
No.  I defer to his opinions 
on that.  If he has come to the 
conclusion that the fire in the rear of this vehicle was more consistent with 
the rear lines, that’s fine.  I 
defer to him.
 
*          
*          
*
 
“Q           
But with regard to the question of the details of whether there was 
enough heat to burn it through versus the forces of the impact, you defer to Mr. 
Sanchez?
 
“A           
Well, I will defer C Ed Sanchez is certainly the fire area, and whether they 
burned through during the fire, I will certainly defer that.  That is his area.  As far as his opinion, again, I think Ed 
Sanchez is coming from the fire position, looking backwards towards the 
system.  Obviously, he saw some 
trauma that he feels could have compromised those hoses, and I will defer to 
him, if that’s his opinion.  I 
certainly am not going to take exception to that.  It is certainly a possibility and I 
agree with him.”

[29] 90 S.W.3d at 731.

[30] Id. at 732.

[31] Id. at 733.

[32] Id.

[33] Id.

[34] See note 16 supra.

[35] Broders v. Heise, 924 S.W.2d 148, 151 (Tex. 1996) (“[T]he party 
offering the expert’s testimony bears the burden to prove that the witness is 
qualified under Texas Rule of Civil Evidence 702.”).   

[36] Coastal Transp. Co. v. 
Crown Cent. Petroleum Corp., 136 S.W.3d 227, 232 (Tex. 2004) (footnote 
omitted).

[37] See note.

[38] See Volkswagen of America, Inc. v. 
Ramirez, ___ S.W.3d ___, ___ (Tex. 2004).

[39] 90 S.W.3d at 743-744.

[40] Cf. Dow Chem. Co. v. Francis, 46 S.W.3d 
237, 241 (Tex. 2001) (“[O]bjection to a trial court’s 
alleged improper conduct or comment must be made when it occurs if a party is to 
preserve error for appellate review, unless the conduct or comment cannot be 
rendered harmless by proper instruction.”) (emphasis 
added).